GREGORY W. STEVENS (USB # 7315)
2825 East Cottonwood Parkway
Cottonwood Corporate Center
Suite 500
Salt Lake County, UT 84121-7060
Telephone: (801) 990-3388
Facsimile: (801) 606-7378
Email: utlaw@aol.com
*Attorney for Plaintiff*
*Hyrum James Geddes*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| HYRUM JAMES GEDDES,<br><br>*Plaintiff,*<br><br>v.<br><br>WEBER COUNTY, WEBER COUNTY SHERIFF'S OFFICE, and CORPORAL WAYNE MOSS, DEPUTY ROBERT SHANER, DEPUTY KARLEE DRAKE, AND DEPUTY JAMIE TOONE (formerly BEYER), in their individual capacities,<br><br>*Defendants.* | **PLAINTIFF HYRUM JAMES GEDDES' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:18-cv-00136-HCN-PMW<br>Judge Howard C. Nielson, Jr<br>Chief Magistrate Judge Paul M. Warner |

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RESPONSE TO DEFENDANTS' STATEMENT OF
MATERIAL FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF ADDITIONAL MATERIAL FACTS. . . . . . . . . . . . . . . . . . 19

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.      SUMMARY JUDGMENT IS INAPPROPRIATE ON THE
       INDIVIDUAL DEFENDANTS' DEFENSE OF QUALIFIED
       IMMUNITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

       *A.*    *THERE EXISTS A TRIABLE FACTUAL ISSUE WHETHER*
           *THE INDIVIDUAL DEFENDANTS USED EXCESSIVE FORCE.* . . 26

            1.    Aggregate Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

            2.    Individual Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

                *a.*    *Corporal Moss.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

                *b.*    *Deputy Shaner.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                *c.*    *Deputies Drake and Toone.* . . . . . . . . . . . . . . . . . 35

       *B.*    *MR. GEDDES' RIGHT TO BE FREE FROM A USE OF*
           *EXCESSIVE FORCE IN THE CIRCUMSTANCES PRESENTED*
           *HERE WAS CLEARLY ESTABLISHED* . . . . . . . . . . . . . . . . . . . . . 37

II.     SUMMARY JUDGMENT IS INAPPROPRIATE ON
        MR. GEDDES' CLAIM AGAINST THE COUNTY.. . . . . . . . . . . . . . . . 40

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . 24

*Barr v. City of Albuquerque*, No. 12-CV-01109-GBW/RHS,
2014 U.S. Dist. LEXIS 187034 (filed Oct. 23, 2014). . . . . . . . . . . . . . . . . . . . 20

*Bd. of County Comm'rs v. Brown*, 520 U.S. 397 (1997). . . . . . . . . . . . . . . . . . . 41

*Bryson v. County of Okla. County*, 627 F.3d 784 (10th Cir. 2010),
*cert. denied*, 131 S. Ct. 3030 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42,44

*Casey v. County of Fed. Heights*, 509 F.3d 1278 (10th Cir. 2007). . . . . . . . . 32,38

*Cavanaugh v. Woods Cross County*, 625 F.3d 661 (10th Cir. 2010). . . . . . . . 3,26

*Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 32

*Finlinson v. Millard Cty.*, 2018 U.S. Dist. LEXIS 185262,
2018 WL 5438436 (D. Utah October 29, 2018). . . . . . . . . . . . . . . . . . . . . . . 31,39

*Fisher v. County of Las Cruces*, 584 F.3d 888 (10th Cir. 2009). . . . . . . . . . . . . 27

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008). . . . . . . . . . . . . . . . . 31,35,36

*Garcia v. Pueblo Country Club*, 299 F.3d 1233 (10th Cir. 2002). . . . . . . . . . . . 24

*Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992),
*cert. denied*, 510 U.S. 932 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Page*

*Graham v. Connor*, 490 U.S. 386 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . 27,28,38

*Grass v. Johnson,* 322 Fed. Appx. 586 (10th Cir. 2009). . . . . . . . . . . . . . 28,34,35

*Jones v. Norton*, 809 F.3d 564 (10th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . 39

*Lundstrom v. Romero*, 616 F.3d 1108 (10th Cir. 2010). . . . . . . . . . . . . . . . . 29,34

*Mascorro v. Billings*, 656 F.3d 1198 (10th Cir. 2011). . . . . . . . . . . . . . . . . . 35,36

*Mick v. Brewer*, 76 F.3d 1127 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . 33,39

*Mondragon v. Thompson*, 519 F.3d 1078 (10th Cir. 2008). . . . . . . . . . . . . . . . . 2

*Monell v. New York County Dept. of Soc. Servs.*, 436 U.S. 658 (1978). . . . . . 40,41

*Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012). . . . . . . . . . . . . . . . . . . . . 28,37,38

*Olseth v. Larson*, Case No. 2:02-cv-1122-CW, 2009 U.S. Dist. LEXIS 96, 2009 WL 44686 (D. Utah Jan. 5, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3

*Perea v. Baca*,  817 F.3d 1198 (10th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . 39

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . 38

*Plascencia v. County of St. George*, 705 F. Supp. 2d 1276 (D. Utah 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,34,35

*Pyle v. Woods*, 874 F.3d 1257 (10th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . 41

*Robles v. Schultz*, 2010 U.S. Dist. LEXIS 29333 (D.N.M. Mar. 15, 2010). . . . . . 34

*Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992)................. 19

*Rush v. County of Mansfield*, 771 F. Supp. 2d 827 (N.D. Ohio 2011)......... 42

*Saucier v. Katz*, 533 U.S. 194 (2001)................................... 37

*St. Louis v. Praprotnik*, 485 U.S. 112 (1988)....................... 41,42,44

*T.D. v. Patton*, 868 F.3d 1209 (10th Cir. 2017)........................... 25

*United States v. Richter*, 796 F.3d 1173 (10th Cir. 2015)................. 19

*Walton v. Gomez (In re Estate of Booker)*,
745 F.3d 405 (10th Cir. 2014)................................... 26,29,31,
                                                                  32,35,36

*Weigel v. Broad*, 544 F.3d 1143  (10th Cir. 2008),
*cert. denied*, 556 U.S. 1236 (2009)........................... 28,29,34,35

*Zuchel v. City and County of Denver*, 997 F.2d 730 (10th Cir. 1993)......... 19

### United States Constitution

U.S. Const., amend IV........................................ passim

U.S. Const., amend XIV. ...................................... passim

### Federal Statutes

42 U.S.C. § 1983............................................ passim

## Federal Rules of Civil Procedure

Fed. R. Civ. P. 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## Utah Code

Utah Code § 41-6A-601. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Utah Code § 41-6A-602.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Utah Code § 76-10-528. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# INTRODUCTION

In accordance with Rule 56 of the Federal Rules of Civil Procedure and DUCivR 56-1, Plaintiff Hyrum James Geddes, by and through his undersigned counsel, respectfully submits this Memorandum in opposition to the Motion for Summary Judgment filed by Defendant Weber County (the "County"),[1] Defendant Weber County Sheriff's Office ("WCSO") and Defendants Corporal Wayne Moss, Deputy Robert Shaner, Deputy Karlee Drake, and Deputy Jamie Toone, formerly Beyer (collectively, the "Individual Defendants"), with all Defendants referred to, collectively, as "Defendants".

Mr. Geddes alleges in his Amended Complaint that (1) each of the Individual Defendants violated clearly established statutory and constitutional rights of which a reasonable person would have known, based on their use of excessive force against Mr. Geddes, D. Ct. Doc. No. 15 (Amended Complaint) ¶¶ 1 and 64-67; and (2) the County also violated clearly established statutory and constitutional rights of which

---

[1] Defendants assert (Motion at pp. 12-13) that Mr. Geddes cannot maintain a civil action against the Weber County Sheriff's Office ("WCSO") as a separate Defendant, because the Sheriff's Office is not a separate legal entity from Defendant Weber County and is not amenable to suit under Section 1983. Mr. Geddes concedes this point. Accordingly, the Court should dismiss, with prejudice, the claim against the WCSO as a distinct and separate entity.

a reasonable person would have known by having a custom, policy or practice that encouraged, permitted, condoned or ratified the activity in which the Individual Defendants engaged, id. ¶¶ 1 and 70-74.

Defendants have moved for summary judgment on Mr. Geddes' claims. Defendants contend that (1) the Individual Defendants are entitled to qualified immunity on Mr. Geddes' claim alleging use of excessive force; and (2) that Mr. Geddes cannot establish liability of the County under Section 1983.[2]

---

[2] Defendants also contend (Motion at pp. 3-5) that, because Mr. Geddes cites to the Fourteenth Amendment in his Amended Complaint, Mr. Geddes cannot pursue his claims against Defendants based on use of the standard applicable to a claim of excessive force under the Fourth Amendment. That contention, however, borders on the frivolous. In fact, Mr. Geddes has asserted his claims "pursuant 42 U.S.C. § 1983" against the Individual Defendants, for their use of excessive force, and against the County, for, among other things, its ratification of the conduct of the Individual Defendants, all based on rights secured by the Fourteenth Amendment D. Ct. Doc. No. 15 (Amended Complaint), ¶¶ 1, 33, 67, 72. Yet, the Fourth Amendment applies directly only to claims against the federal government. Here, as claims against a county and individuals employed by Weber County, Mr. Geddes' claims can be brought only pursuant to the Fourteenth Amendment, because that Amendment incorporates the Fourth Amendment's protections against the states and their political subdivisions. *E.g., Mondragon v. Thompson*, 519 F.3d 1078, 1082 n. 3 (10th Cir. 2008) (so stating); *Olseth v. Larson*, Case No. 2:02-cv-1122-CW, 2009 U.S. Dist. LEXIS 96, *5-6, 2009 WL 44686 (D. Utah Jan. 5, 2009) (Waddoups, J.) (same). Accordingly, as written, the claims set out in Mr. Geddes' Amended Complaint cite to the appropriate Amendment. Moreover, despite Defendants' protestations that they were not put on notice that Mr. Geddes was pursuing a claim
(continued...)

Defendants' contentions, however, are not well taken. *First*, the record presents genuine issues of material fact as to the question whether Defendants are shielded from liability by application of the defense of qualified immunity. Under clearly established law, the actions of the Individual Defendants was obviously egregious and lacked a legitimate justification. *Second*, the record also presents genuine issues of material fact as to whether the County, through its policymaker, ratified the conduct of the Individual Defendants and, in so doing, adopted a policy that approved of or condoned their conduct.

---

[2](...continued)
under Section 1983 for use of excessive force, it is obvious from Defendants' argument (Motion at pp. 4-5) that they know precisely what Mr. Geddes is asserting – that, while in the custody at the County Jail after being arrested for a DUI, he was subjected to use of excessive force by the Individual Defendants. Plainly, the Amended Complaint provided Defendants with sufficient notice of those claims. *E.g., Olseth*, 2009 U.S. Dist. LEXIS 96, *5-7 (concluding that plaintiff's claim for use of excessive against a city and its officers under Section 1983, which cited to the Fourteenth Amendment and not the Fourth Amendment, put defendants on notice of nature of claims being asserted). Finally, the Amended Complaint repeatedly alleges that the Individual Defendants violated Mr. Geddes' rights when they used force that was "objectively unreasonable" in light of the circumstances presented. Doc. No. 15 (Amended Complaint) ¶¶ 1, 31, 32, and 40. That is the Fourth Amendment standard applicable to excessive force claims. *E.g., Cavanaugh v. Woods Cross County*, 625 F.3d 661, 664 (10th Cir. 2010). Consequently, in light of all of this, it is difficult to take seriously Defendants' protestation of lack of notice.

## RESPONSE TO DEFENDANTS' STATEMENT
## OF MATERIAL FACTS

In accordance with DUCivR 56-1, Mr. Geddes responds below to each of the facts set out in Defendants' Statement of Undisputed Material Facts as to which a dispute of material fact exists:

**Defendants' ¶ 1 (Motion at p. 2, ¶ 1):**

Plaintif Hyrum Geddes original Complaint was filed on October 23, 2018 and brought claims under the Fourteenth Amendment of the United States Constitution as it related to Mr. Geddes's arrest and booking at the Weber County Jail in July 2017. (Citing D. Ct. Doc. No. 2 ¶ 1.)

*Response*: This assertion does not capture Mr. Geddes' claims in his initial Complaint accurately. In his initial Complaint, Mr. Geddes asserted claims pursuant to 42 U.S.C. § 1983, (a) against the Individual Defendants for their use of excessive force against Mr. Geddes that was objectively unreasonable given that no force was necessary at all, a right secured by the Fourteenth Amendment; and (b) against the County and WCSO based, among other things, on their ratification of the actions of the Individual Defendants by the County, also a right secured by the Fourteenth Amendment. D. Ct. Doc. No. 2 (Complaint) ¶¶ 1, 64-67, and 70-74.

**Defendants' ¶ 2 (Motion at p. 2, ¶ 2):**

An Amended Complaint was filed on February 11, 2019, adding four new individual Defendants. The Amended Complaint still brought claims only under the Fourteenth Amendment of the United States Constitution. (Citing D. Ct. Doc. No. 15 ¶ 67, ¶ 74.)

*Response*: The assertion that Mr. Geddes' Amended Complaint substituted the

Individual Defendants for Does 1 through 4 in the Initial Complaint is accurate. The

remainder of this allegation does not capture the claims asserted by Mr. Geddes in his

Amended Complaint accurately. In his Amended Complaint, Mr. Geddes repeats the

same claims, noted above, that he made in his initial Complaint. D. Ct. Doc. No. 15

(Amended Complaint) ¶¶ 1, 64-67, and 70-74.

**Defendants' ¶ 4 (Motion at p. 2, ¶ 4):**

At approximately 4:00 p.m. on July 16, 2017 while being booked in the jail Mr. Geddes was asked to remove his boots as part of the standard search process. Mr. Geddes refused to remove his boots and demanded a drink of water before he would remove his boots. (Citing Def. Exh. 2 (Geddes Dep. Tr.) at 34:25-35:18, 36:2-20.)

*Response*: These assertions do not quite accurately reflect Mr. Geddes' testimony

cited by Defendants. Mr. Geddes testified that the jailers demanded that he remove

his boots; that he tried to use the attention being given to him to get a glass of water

after not having had any water since he was arrested; that he could not remove his

boots because his arms and hands were handcuffed behind his back; and that he did not remove his boots. Def. Exh. 2 (Geddes Dep. Tr.) at 34:25-36:20.

**Defendants' ¶ 5 (Motion at p. 2, ¶ 5):**

> This entire incident that is alleged in the Amended Complaint was captured on video and clearly shows that Mr. Geddes was not beat up by the Defendants, contrary to what is alleged in the pleadings. (Citing Def. Exh. 3 (Thompson Decl.).)

*Response*: The assertion that the incident at issue in this civil action was captured on a video, with no audio, is accurate. The assertion that the video shows that Mr. Geddes was not beaten by the Individual Defendants is false, as shown by the following facts of record:

a. The video shows that the Individual Defendants – Corporal Wayne Moss, Deputy Robert Shaner, Deputy Karlee Drake, and Deputy Jamie Toone – are all standing outside a holding cell at the Weber County Jail that contains only Mr. Geddes Def. Exh. 3 (video) at 3:58:10-13; see also Pl. Exh. A (Moss Dep. Tr.) at 9:6-18; Pl. Exh. B (Shaner Dep. Tr.) at 4:24-5:13.

b. The holding cell in which the incident occurred had concrete, cinder-block walls, a concrete floor, and a metal door. Pl. Exh. B (Shaner Dep. Tr.) at 22:3-15.

c.  At the start of the interaction, Deputy Shaner is the male who is closest to the window of the cell on the left side of the video.  Deputy Shaner is facing Corporal Moss.  To Deputy Shaner's right, are the two female deputies, Deputy Toone and Deputy Drake.  Mr. Geddes is inside the holding cell.  Def. Exh. 3 (video) at 3:58; Pl. Exh. B (Shaner Dep. Tr.) at 5:3-11; Pl. Exh C (Toone Dep. Tr.) at 6:24-7:8.

d.  Deputy Toone testified that she was present as backup for Corporal Moss and Deputy Shaner, to make sure that they were safe and to assist them, and also to help with training Deputy Drake.  Pl. Exh. C (Toone Dep. Tr.) at 3:22-4:10.

e.  At the time of the incident at issue, Deputy Shaner weighed about 250 pounds and Corporal Moss was larger.  Pl. Exh. B (Shaner Dep. Tr.) at 15:20-16:14.  According to the Citation issued to Mr. Geddes, he was rather thin at 6'1" and 175 pounds.  Def. Exh. 1 (DUI Summons and Citation).

f.  The video then shows Corporal Moss and Deputy Shaner go into the cell with Mr. Geddes.  Mr. Geddes was still in handcuffs and facing a wall of the cell.  Def. Exh. 3 (video) at 3:58:16; see also Pl. Exh. A (Moss Dep.. Tr.) at 9:6-18.  Corporal Moss enters the holding cell first and Deputy Shaner follows Corporal

Moss.  The two female Deputies remain outside of the cell.  Def. Exh. 3 (video) at 3:58:13; Pl. Exh. B (Shaner Dep. Tr.) at 5:17-22.

g.  On the video, Corporal Moss is toward the front of the cell, closer to the camera, and Deputy Shaner is toward the back of the cell.  Pl. Exh. B (Shaner Dep. Tr.) at 6:9-12.  Corporal Moss is the person who actually grabbed Mr. Geddes and took him to the ground.  Pl. Exh. B (Shaner Dep. Tr.) at 7:11-20.

h.  Corporal Moss and Deputy Shaner both physically participated in taking Mr. Geddes to the ground and, in so doing, threw him in a continuous motion from a standing position, with substantial force and violence, so that he was driven head first into the concrete wall of the cell.  As the video shows, Mr. Geddes' head hit the concrete wall with substantial force and speed  Def. Exh. 3 (video) at 3:59:04; Pl. Exh. B (Shaner Dep. Tr.) at 7:4-6; 16:23-17:7; and 20:7-13 and 21:2-24 (describing the use of technique by which they "attached to the subject" and, using a sweeping motion reflected on the video, Def. Exh. 3, at 3:59:04, that resulted in Mr. Geddes' "head hitting a couple of different walls").

i.  Mr. Geddes likewise testified during his deposition that he recalls having been grabbed and slammed into a corner where two walls met and then being slammed down hitting his head and face; that he had three separate large goose eggs

and physical damage to the exterior of his head and skull; and that he had to go directly to the hospital when he was released. Def. Exh. 2 (Geddes Dep. Tr.) at 38:5-17; and 44:12-16.

j. Once Mr. Geddes was on the ground, Corporal Moss, weighing in at greater than 250 pounds, placed himself on top of Mr. Geddes and used his weight to push his knees against Mr. Geddes' neck at the base of his skull to hold him against the floor. Def. Exh. 3 (video) at 3:59:04; Pl. Exh. A (Moss Dep. Tr.) at 12:2-21; Pl. Exh. C (Toone Dep. Tr.) at 7:8-10.

k. The use of unnecessary and substantial force by the Individual Defendants caused Mr. Geddes to suffer a serious head injury, substantial injury to his elbow and wrists (from the handcuffs that he was still wearing), and significant injury to both of his knees. Shortly after the use of such force by the Officers, Mr. Geddes experienced blurry vision, cognitive difficulties, and substantial pain to the back and side of his head. Pl. Exh. D (Plaintiff Hyrum James Geddes' Responses to Defendants' First Sets of Interrogatories and Requests for Production of Documents (July 17, 2019) ("Plaintiff's Responses")) at p. 9 (Response to Interrogatory No. 11) and p. 18 (verified under penalty of perjury).

l.   Having observed the seriousness of the injuries that Mr. Geddes had sustained, Mr. Geddes' brother took him immediately to the Emergency Room at McKay Dee Hospital, where he was given an x-ray of his elbow and a CT scan of his head.  After he was released, Mr. Geddes could barely wash his hair that night due to the tenderness of his head.  When he tried to lie down. Mr. Geddes could only lie on one side because of the pain in his head and elbow.  Mr. Geddes awoke frequently from the pain and flashbacks of the beating that he had experienced by the Correctional Officers.  Pl. Exh. D (Plaintiff's Responses) at p. 9 (Response to Interrogatory No. 11).

m.   Over the next couple of days, Mr. Geddes fell in and out of consciousness and was unable to get out of bed.  Mr. Geddes also lost his appetite and experienced depression as a result of the pain and beating.  Mr. Geddes constantly had a headache and anything, including noise, light, standing up or even moving, made the headache worse.  Following the beating, Mr. Geddes continued to experience dizziness and became so lightheaded and faint that he would need to sit or lie down for a period.  Also following the beating, Mr. Geddes  experienced confusion in trying to handle everyday tasks and was unable to or struggled to complete ordinary tasks; and felt clumsy and stumbled throughout the day.  For the

first few days following the beating, Mr. Geddes was unable to read due to his blurred vision. Pl. Exh. D (Plaintiff's Responses) at p. 9 (Response to Interrogatory No. 11).

n. The affect of the beating has continued. As a further consequence of the beating, Mr. Geddes also was unable to remember events in his past. Mr. Geddes also continues to experience extreme pain in his knees, elbow and wrists as a result of the beating. Mr. Geddes' headaches have reduced in frequency but he still experiences painful headaches that resulted from the beating; and his left eye does not appear to open as much as his right eye. Mr. Geddes also continues to experience cognitive difficulties and difficulties with coordination as a result of the injuries inflicted by the Individual Defendants, difficulties which, Mr. Geddes has been informed and believes, will continue for the rest of his life. Pl. Exh. D (Plaintiff's Responses) at p. 10 (Response to Interrogatory No. 11).

o. In light of the continuing affects of the injuries that he sustained as a result of the use of force by the Individual Defendants, Mr. Geddes anticipates that the affects of the beating that he endured will continue. In particular, based on the affects of the injuries that he sustained that have continued to today, Mr. Geddes anticipates that he will suffer physically and mentally from the beating inflicted by

the Individual Defendants. Pl. Exh. D (Plaintiff's Responses) at p. 10 (Response to Interrogatory No. 11).

**Defendants' ¶ 8 (Motion at p. 3, ¶ 8):**

The Sheriff, the County's final policymaker, was never involved in the booking incident and had no prior knowledge of it. (Citing Def. Exh. 3 (Thompson Decl.) ¶¶ 3-4.)

*Response*: The assertion that Sheriff Terry Thompson is the County's final policymaker is not disputed. It is unclear what Defendants mean when they say that the Sheriff had "no prior knowledge" of the incident at issue in this civil action. Certainly, the Sheriff had no knowledge of the incident before it happened; and, accordingly, that assertion, if that is the intended meaning, is not disputed. The assertion that the Sheriff "was never involved" in the incident, however, is disputed, based on the following facts of record:

a.    Sheriff Thompson became aware of the incident, through the County's counsel, in or around October or November 2018. Pl. Exh. E (Thompson Dep. Tr.) at 3:18-4.

b.    Sheriff Thompson did not investigate the incident himself. Instead, he testified, he directed Deputy Jason Talbot, whom Sheriff Thompson identified as

the Chief Deputy at the time, to investigate the incident. Pl. Exh. E (Thompson Dep. Tr.) at 4:5-5:2.

        c.  Deputy Talbot testified during his deposition that, though he had worked for the County with the WCSO from August 1996 to May 2019, he was not asked to investigate the incident at issue in this civil action, that he had never viewed the video identified as Defendants' Exhibit 3, that he has no knowledge whatsoever about the incident and that he never talked to anyone about the incident. Pl. Exh. F (Talbot Dep. Tr.) at 3:10-5:15.

        d.  Deputy Kevin Burton, who worked for the County with the WCSO from October 1990 until January 2018, was actually the Chief Deputy of the Corrections Division at the time of the incident at issue here. Chief Deputy Burton first learned about the incident when he was contacted for his deposition in this civil action and had not conducted any investigation into the incident. Pl. Exh. G (Burton Dep. Tr.) at 3:9-4:5.

        e.  Chief Deputy Burton further testified that, when force is used in the Corrections Division, the practice was to prepare use-of-force reports and forward those reports up the chain of command. Pl. Exh. G (Burton Dep. Tr.) at 4:6-13. No

use-of-force reports were produced by Defendants in this civil action and none appear to have been created.  Id.

f.  The current Weber County Sheriff, Ryan Arbon, likewise testified that he did not conduct, and was not asked to conduct, an investigation of the incident, did not review the video of the incident, and did not know whether Sheriff Thompson had conducted an investigation of the incident.  Pl. Exh. H (Arbon Dep. Tr.) at 4:15-22.

g.  Sheriff Thompson had himself reviewed the video that is part of the record as Defendant's Exhibit 3 just prior to his deposition in this civil action.  Pl. Exh. E (Thompson Dep. Tr.) at 5:6-12.

h.  Sheriff Thompson, as the final policymaker on behalf of the County, concluded that "[t]he action they took was totally appropriate to me."  Pl. Exh. E (Thompson Dep. Tr.) at 10:1-8 and 11:15-21.  In particular, the Sheriff concluded from watching the video that excessive force was not used against Mr. Geddes, because, the Sheriff said, he was "running his mouth from the time he came in," [h]e was clearly noncompliant," and he made a "threatening move" by turning to face the Deputy and Corporal.  Pl. Exh. E (Thompson Dep. Tr.) at 5:19-7:9.

i.  Sheriff Thompson first testified that he could not recall whether Mr. Geddes was handcuffed during the incident.  Pl. Exh. E (Thompson Dep. Tr.)

at 7:7-9.  The Sheriff later testified, while being shown the video, that Mr. Geddes

"[m]ay have been" handcuffed.  Pl. Exh. E (Thompson Dep. Tr.) at 9:14-15.  He

added:

> It doesn't matter to me if he was handcuffed or not.  He was
> noncompliant, he turned aggressively towards [sic.] the deputies, they
> appropriately took him down.  It doesn't matter.

Pl. Exh. E (Thompson Dep. Tr.) at 9:15-18.

      j.  None of the personnel involved in the incident at issue in this civil

action were subjected to any disciplinary action as a result of the incident.  Pl. Exh. H

(Arbon Dep. Tr.) at 4:23-5:1.

**Defendants' ¶ 9 (Motion at p. 3, ¶ 9):**

> Weber County had policies and procedures to ensure that no contraband
> entered the Jail and that force used was within constitutional bounds.
> (Citing Def. Exh. 6 (Jail's Inmate Reception Policy attached to the
> Declaration of Sheriff Thompson).)

*Response*:  The assertion that Weber County had policies and procedures to ensure

that no contraband entered the Jail is not disputed.  The assertion that the County had

policies and procedures in place to ensure that its employees assigned to deal with

inmates did not violate the Constitution is false, in light of the following facts of

record:

a. As noted above in responding to Defendant's Paragraph 8, Sheriff Thompson, as the County's final policymaker, testified that the actions of the Corporal and Deputies was appropriate, because Mr. Geddes had been mouthing off, he was no compliant, and he turned to face the Corporal. It did not matter to the Sheriff, as the final policymaker, whether Mr. Geddes was handcuffed.

b. As the video shows, during the incident at issue in this civil action, Mr. Geddes was always in handcuffs behind his back and posed no threat to the safety of Corporal Moss or any of the Deputies. Def. Exh. 3 (video) at 3:58:05 Pl. Exh. A (Moss Dep. Tr.) at 8:18-21; Pl. Exh. B (Shaner Dep. Tr.) at 5:20-22.

c. According to Corporal Moss, the reason that they took that action is that Mr. Geddes was argumentative and turned his head toward Deputy Shaner. For that reason, Corporal Moss testified, he grabbed Mr. Geddes and started pushing him. Also according to Corporal Moss, at that point, he did not believe that Mr. Geddes posed a threat to his safety. Def. Exh. 3 (video) at 3:58:47-3:59:06; see also Pl. Exh. A (Moss Dep.. Tr.) at 10:7-21.

d. Corporal Moss later testified that, when he and Deputy Shaner engaged Mr. Geddes physically and took him violently to the ground, it was "possible" that he posed a threat to their safety. Pl. Exh. A (Moss Dep. Tr.) at 11:1-6.

Deputy Drake testified that she could not recall why Corporal Moss and Deputy Shaner took Mr. Geddes to the ground. Pl. Exh. I (Drake Dep. Tr.) at 7:11-14 (discussing the video. Def. Exh. 3, at 3:59:06).

e. The reasons proffered by Deputy Shaner for violently taking Mr. Geddes to the ground differed from those proffered by Corporal Moss. Deputy Shaner offered a multitude of reasons, testifying that they took Mr. Geddes to the ground because he was "not compliant" with their command to remove his boots, he turned toward them to face them, he possibly had contaminated saliva, and they did not know if he possesses combative skills like martial arts. Pl. Exh. B (Shaner Dep. Tr.) at 6:15-25; and 7:24-8:18.

f. Deputy Shaner testified that Mr. Geddes was a threat to the safety when he turned away from the wall and toward facing Corporal Moss. Even though Mr. Geddes was still handcuffed behind his back at that point, Deputy Shaner described this move as "aggressive" and a threat to their safety. Pl. Exh. B (Shaner Dep. Tr.) at 8:23-9:8 (describing interaction reflected on the video, Def. Exh. 3, at 3:58:20-47).

g. Deputy Shaner testified that he could not recall whether, when Corporal Moss and Deputy Shaner took Mr. Geddes violently to the ground, he

resisted in any way. Pl. Exh. B (Shaner Dep. Tr.) at 9:9-11. Likewise, Deputy Toone could not say whether, when Corporal Moss and Deputy Shaner brought Mr. Geddes to the ground, he was resisting. Pl. Exh. C (Toone Dep. Tr.) at 10:17-20. When Mr. Geddes described the incident during his testimony, there was no indication that he resisted in any way. Def. Exh. 2 (Geddes Dep. Tr.) at 37:23-38:25.

h. Deputy Shaner testified that, after he graduated from POST, he received "annual use of force training" from the County in which he learned about the "force continuum." That approach to the use of force, as he understood it, is a "loosely based structure as far as the amount of resistence shown by a subject and our force applied to gain compliance to that level of resistence ...." Pl. Exh. B (Shaner Dep. Tr.) at 10:4-24.

i. Corporal Moss testified that the training that he received from Weber County concerning use of force included "[d]efensive tactics on how to take inmates to the ground," how to protect themselves from knives and being punched and kicked, and engaging in "ground fighting." Pl. Exh. A (Moss Dep. Tr.) at 8:8-17.

j. Deputy Drake testified that, pursuant to the policy of the WCSO and as taught during POST, a reasonable amount of force, on a force continuum, is one step higher than what is being exhibited by the subject. Pl. Exh. I (Drake Dep. Tr.)

at 11:1-20.  She further testified that she was taught that, when a subject is not complying with a command of a Deputy, they give them a chance to comply and then "do what's necessary to get that task completed for our safety and others."  Pl. Exh. I (Drake Dep. Tr.) at 12:2-8.

k.  Deputy Toone testified that reasonable force is the "[t]he level above what the individual is exhibiting until they de-escalate, until they start following our verbal commands that we're telling them to follows.  Once he starts following, all of the use of force will stop."  Pl. Exh. C (Toone Dep. Tr.) at 9:16-22.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

Scott A. DeFoe, an expert designated by Mr. Geddes on issues pertaining to liability, has reached the following conclusions based on an application of his expertise to the facts reflected in the record in this case:[3]

---

[3]  Although an expert may not give an impermissible legal conclusion, an expert may give testimony that embraces an ultimate issue so long as the expert's testimony assists, rather than supplants, the jury's judgment.  *Id.* at 1195-96 *United States v. Richter*, 796 F.3d 1173, 1195-96 (10th Cir. 2015).  In keeping with these principles, expert testimony like that being offered by Mr. DeFoe here is appropriate.  *E.g.,. Zuchel v. City and County of Denver*, 997 F.2d 730, 742 (10th Cir. 1993) (stating that courts generally allow experts in police training, tactics, and use of deadly force to state opinions on whether conduct at issue was necessary or fell below accepted standards in field of law enforcement); *Russo v. City of Cincinnati*, 953 F.2d
(continued...)

1.  The use of force by the Corporal and Deputies against Mr. Geddes – when they forcibly took Mr. Geddes to the floor of the cell, slammed his head against the concrete wall, and pressed his neck against the concrete floor – was unnecessary and excessive.  It was also foreseeable that Mr.  Geddes would be injured when he was taken to the floor of the small jail cell, because his arms and hands were handcuffed behind his back and he was unable to brace his fall by using them.  Pl. Exh. J (DeFoe Expert Report) at pp. 7-10.  This expert opinion is based on an application of Mr. DeFoe's expertise and is informed and based on the facts cited in Mr. DeFoe's Expert Report, including the following:

    a.  Mr.  Geddes was effectively and completely restrained prior to the use of force.  He was alone in his cell and his arms were handcuffed behind his back

---

[3](...continued)
1036, 1046-47 (6th Cir. 1992) (rejecting the argument that testimony of plaintiff's expert in police procedures was conclusory and insufficient to preserve genuine question of material fact over city's liability); *Barr v. City of Albuquerque*, No. 12-CV-01109-GBW/RHS, Order on Motions Relating to Expert Testimony 5, 2014 U.S. Dist. LEXIS 187034 (filed Oct. 23, 2014), ECF No. 272 (concluding that testimony about tactics available to officers and of which reasonable officers ought to be aware is admissible, including testimony about methods used to approach subjects, de-escalation techniques and other tactics).  Mr. DeFoe's Expert Report makes clear that he possesses substantial knowledge and expertise, gained through a 28-year career in law enforcement and investigation of greater than 100 use-of-force incidents, that would assist the jury here.

prior to the use of force. There was no evidence that Mr. Geddes was actually a threat to anyone. The DUI Summons and Citation issued by the Utah Trooper makes no mention of a threat of violence toward the Trooper. As a consequence, there was no potential for injury to the Corporal or Deputies, there was no risk of flight by Mr. Geddes, and there was no need for immediate control in order to maintain or restore order to the Jail. Pl. Exh. J (DeFoe Expert Report) at pp. 5-6, 10 and 12.

b. The Corporal and Deputies should have but failed to formulate a tactical plan prior to entering Mr. Geddes' cell. If he became noncompliant after they entered the cell, they simply could have exited the cell and discussed other tactical options. Pl. Exh. J (DeFoe Expert Report) at p. 6.

c. Mr. Geddes was not resisting or attacking the Corporal or Deputies, based on a review of the video and the record. The Incident Report, apparently prepared by Corporal Moss, does not document that, at any time, Mr. Geddes resisted or attacked any of the Deputies. None of the other Deputies involved claimed that Mr. Geddes was resisting. Pl. Exh. J (DeFoe Expert Report) at pp. 11-12.

d. The Corporal and Deputies failed to make use of other options that were available. Escalating the situation, as they did, was unnecessary. In particular, they should have utilized an alternative verbal strategies, defusing techniques, and de-

escalation techniques to convince Mr. Geddes to comply prior to using any force option. Pl. Exh. J (DeFoe Expert Report) at p. 5.

e. If and when Corporal Moss was unsuccessful utilizing verbal strategies to gain Mr. Geddes' compliance, he should have requested any of the other three Deputies that were present to function as an intermediary to request Mr. Geddes to remove his boots and surrender any other personal property he had in his possession; and the verbal strategies and use of a third-party intermediary should have been utilized from outside of the cell. Pl. Exh. J (DeFoe Expert Report) at p. 5. In addition, in the event that that approach was unsuccessful, the Corporal and Deputies should have advised Mr. Geddes that his noncompliance could result in additional criminal charges or the use of a force option such as oleoresin capsicum spray deployed though the tray slot in the door. Pl. Exh. J (DeFoe Expert Report) at pp. 10-11.

f. Mr. Geddes should have been searched to include his boots upon arrival at the Weber County Jail and prior to being placed inside of a cell. Alternatively, Corporal Moss should have removed Mr. Geddes' handcuffs via the door slot and then requested him to remove his boots. That approach would have allowed Mr. Geddes to use his hands to remove his boots, given that it would be

difficult at best to remove his boots with his hands handcuffed behind his back. Pl. Exh. J (DeFoe Expert Report) at p. 5.

g. The suspected offenses were not, relatively speaking, serious. Mr. Geddes was arrested for a Misdemeanor B charge of impaired driving, Utah Code § 41-6A-602.5; a Misdemeanor B charge of carrying a dangerous weapon in the back of his pickup truck while under the influence, Utah Code § 76-10-528; and an infraction for speeding, Utah Code § 41-6A-601.

h. The WCSO failed to conduct a Use of Force Investigation to determine whether the use of force by the Corporal and Deputies against Mr. Geddes was reasonably necessary in performance of their duties. The record shows that neither Sheriff Thompson nor, as he claimed, his Chief Deputy, conducted an investigation of the incident. Sheriff Thompson's failure to conduct an investigation is contrary to the written policy reflected in WCSO's written policy concerning use of force. See Pl. Exh. K (WCSO, Corrections Division Policy Manual), Policy No. 510.7. The failure to investigate and abide by written policies reflects an endorsement and perpetuation of the conduct of the Corporal and Deputies. Pl. Exh. J (DeFoe Expert Report) at p. 14.

2. Deputy Shaner acted unprofessionally when he left the cell following the violent takedown. In particular, he can be seen on the video smiling and laughing and simulating a takedown. The conduct should have, but did not, result in any sort of review or action by the WCSO. Def. Exh. J (DeFoe Expert Report) at 15-16.

## ARGUMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper only when the record, viewed in a light most favorable to the nonmoving party, shows that there is no genuine issue of material fact. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In determining whether there is a genuine dispute as to a material fact, this Court is called upon to "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Id.* "'The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.'" *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1239 (10th Cir. 2002) (citation omitted).

In light of these principles, it is clear that summary judgment is inappropriate on Mr. Geddes' claims against the Individual Defendants and against the County. As we show below, the record presents genuine issues of material fact on the issues

(1) whether the Defendants are shielded from liability by application of the defense of qualified immunity; and (2) whether the County, through Sheriff Thompson as the final policymaker, ratified the conduct of the Corporal and Deputies.

## I.  SUMMARY JUDGMENT IS INAPPROPRIATE ON THE INDIVIDUAL DEFENDANTS' DEFENSE OF QUALIFIED IMMUNITY.

An individual defendant sued under Section 1983 "may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (ellipsis and internal quotation marks omitted), *cert. denied*, 138 S. Ct. 1270, 200 L. Ed. 2d 419 (2018). After the qualified-immunity defense is raised, "the plaintiff carries a two-part burden to show:  (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (internal quotation marks omitted).  As we make clear below, there plainly exist disputes of material fact as to whether these two requirements are satisfied here, precluding summary judgment.

## A.    THERE EXISTS A TRIABLE FACTUAL ISSUE WHETHER THE INDIVIDUAL DEFENDANTS USED EXCESSIVE FORCE.

Defendants contend (Motion at 7) that the video shows that no party used excessive force against Mr. Geddes while trying to get him to remove his boots; that removing boots is a necessary part of the booking process to prevent an arrestee from hiding contraband or weapons; and it is not appropriate for an arrestee to simply refuse to remove his or her boots.  As shown below, Defendants' contention ignores entirely both well-established legal principles applicable to use of force by law enforcement and the conduct that actually occurred here.[4]

"Excessive force claims are governed by the Fourth Amendment's 'objective reasonableness' standard."  *Cavanaugh*, 625 F.3d at 664.[5]  Under this standard, "the

---

[4]  Defendants also contend that "the law is actually clearly established that using force against an arrestee is not actionable under the Fourteenth Amendment." (Citing *Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 419 (10th Cir. 2014).)  We address that contention in this Memorandum, *infra*, at page 2, footnote 2.

[5]  Defendants assert (Motion at 3-5) that the standard applicable under the Fourth Amendment to an arrestee applies here, because, they say, Mr. Geddes was only an arrestee prior to the judicial determination of probable cause.  The situation presented here, though, is not quite as clear cut as Defendants make it out to be.  In *Walton*, the Tenth Circuit noted that "[t]he Fourth Amendment, by its plan terms, prohibits only 'unreasonable seizures.'" 745 F.3d at 420.  The Fourth Amendment "says noting about the treatment owed to a detainee *after* he or she has been lawfully seized pursuant to probable cause."  *Id.*  When a plaintiff finds himself or herself
(continued...)

question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also Fisher v. County of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (so stating). In determining whether the use of force is unreasonable in a particular situation, this Court is called upon to consider three non-exclusive factors enunciated by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989): (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the

---

[5](...continued)
somewhere between an initial seizure and post-conviction punishment, we look to the Fourteenth Amendment. *Id.* at 419. To be sure, the Court of Appeals has held that the Fourth Amendment, not the Fourteenth, governs excessive force claims arising from an "arrestee detained without a warrant and *prior* to a probable cause hearing." *Id*. Yet, as a practical matter, Mr. Geddes had already been seized when he was standing alone, handcuffed in the jail cell, based on the Trooper's finding of probable cause. Further, there was also no actual probable cause hearing, and, instead, we have a merely a judicial stamp of approval on the Trooper's finding of probable cause for the arrest and detention. As a consequence, one could make an that there was continuing seizure and apply the Fourth Amendment, as Defendants say we should do; or, alternatively, one could also argue that the Fourteenth Amendment should apply because Mr. Geddes had already been seized. *See id.* at 420-21. In reality, as we note below, in light of the facts presented here, there is no practical difference in the outcome in application of the two standards. *E.g., Culver v. Town of Torrington, Wyo.*, 930 F.2d 1456, 1457, 1460 (10th Cir. 1991) (stating that a determination whether to apply the Fourth or Fourteenth Amendment standard was not necessary because there was "no practical difference in the applicable of the standards").

officers or others, and (3) whether he is actively resisting arrest or attempting to flee. *Id*. at 396; *Morris v. Noe*, 672 F.3d 1185, 1195-96 (10th Cir. 2012) (applying three *Graham* factors); *Grass v. Johnson,* 322 Fed. Appx. 586, 589 (10th Cir. Apr. 15, 2009) (applying the *Graham* factors).

In keeping with these principles, the Tenth Circuit has concluded that the question whether use of force is unreasonable after a subject is restrained and no longer poses a threat is an issue of fact for resolution by the jury. *E.g., Grass*, 322 Fed. Appx. at 590; *see also, e.g., Weigel v. Broad*, 544 F.3d 1143, 1151 (10th Cir. 2008) (noting that officer subjected plaintiff to force "unnecessary to restrain him"), *cert. denied*, 556 U.S. 1236 (2009); *Plascencia v. County of St. George*, 705 F. Supp. 2d 1276, 1286-1287 (D. Utah 2010) (Stewart, J.) (denying summary judgment on a claim for use of excessive forced based on evidence presented that an officer placed the plaintiff in handcuffs that were too tight, lifted him up from his wrists, contorted his arms in an awkward and painful position, and repeatedly hit his legs with a baton after the plaintiff had been subdued and no longer posed a threat to anyone).

In light of these principles, a jury could reasonably conclude, whether we evaluate the Individual Defendants' conduct in the aggregate or conduct a separate

analysis for each of the different Individual Defendants, that the officers used unreasonable, excessive force.

### 1. Aggregate Conduct.

Although the Tenth Circuit sometimes conducts separate qualified immunity analyses for different defendants in excessive force cases, the Court of Appeals often does not do so at the summary judgment stage. Instead, the Court will often evaluate officers' conduct in the aggregate. *E.g., Walton*, 745 F.3d at 421 (citing, *inter alia*, *Lundstrom v. Romero*, 616 F.3d 1108, 1126-27 (10th Cir. 2010)). For example, in *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008), two officers handcuffed an arrestee and bound his legs. For three minutes, one of the officers applied pressure to the man's upper torso as the man lay on his stomach, while the other officer went to warm his hands in the police cruiser. The man died of asphyxiation, and his estate sued both officers under § 1983. Even though only one officer placed pressure on the victim's back, the Tenth Circuit did not perform separate analyses for the two officers and denied qualified immunity for both of them. *Id*. at 1155.

Applying this approach here, it is clear that the Individual Defendants used unnecessary and therefore excessive force against him. *First*, perhaps most importantly, the use of force was unnecessary in light of the circumstances presented.

Mr. Geddes was effectively and completely restrained prior to the use of force. He was alone in his cell and his arms were handcuffed behind his back prior to the use of force and there was no evidence that Mr. Geddes was actually a threat to anyone. As a consequence, there was no potential for injury to the Corporal or Deputies, there was no risk of flight by Mr. Geddes, and there was no need for immediate control in order to maintain or restore order to the Jail. *Second*, there is no evidence that Mr. Geddes was resisting or attacking anyone. *Third*, the Corporal and Deputies failed to make use of other options that were available, including de-escalation techniques. *Third*, the Corporal and Deputies could have but failed to advise Mr. Geddes that his noncompliance could result in additional criminal charges or the use of a force option such as pepper spray deployed though the tray slot in the door. *Fourth*, the Corporal and Deputies could and should have removed Mr. Geddes' handcuffs via the door slot and then requested him to remove his boots. *Fifth*, the suspected offenses were neither serious nor violent.

In these circumstances, a jury could reasonably conclude that the Individual Defendants used force gratuitously in an effort to punish Mr. Geddes for mouthing off, that they made use of force after Mr. Geddes when he was, obviously, effectively restrained and posed no threat to the Individual Defendants, and that they used a level

of force that was decidedly unreasonable.  *E.g., Finlinson v. Millard Cty.*, 2018 U.S.

Dist. LEXIS 185262, *39, 2018 WL 5438436 (D. Utah October 29, 2018)

(Campbell, J.); *Fogarty v. Gallegos*, 523 F.3d 1147, 1161-62 (10th Cir.

2008)(denying defense of qualified immunity; and concluding that, on the plaintiff's

side of the reasonableness scale, the amount of force used by police against him was

considerable, based on the plaintiff's claim that four to five officers grabbed him,

thrust him to the ground, forcibly escorted him through a cloud of tear gas, used

substantial force to put his wrist into a painful hyper-flexion position, and caused a

torn tendon).  Through his analysis of each of the factors noted above, Mr. DeFoe's

expert opinion confirms the correctness of this conclusion.[6]

---

[6] As we note above, in light of the facts presented here, there is really no practical difference between application of the standards applicable under the Fourth and Fourteenth Amendment to a claim of use of excessive force.  Under the Fourteenth Amendment, we are called upon to consider three factors: "'the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor.'"  *Walton*, 745 F.3d at 423 (citation omitted).  A finding of excessive force under the Fourth Amendment is "highly relevant to the 'relationship between the amount of force used and the need presented' in the first part of the excessive force inquiry under the Fourteenth Amendment."  *Id*. at 424 n. 26.  Accordingly, the Court of Appeals has relied on case law applicable under the Fourth Amendment in applying the Fourteenth Amendment standard.  *Id.*  Likewise, here, where there was no objective need for the use of force here against Mr. Geddes because he was completely restrained and posed no actual

(continued...)

## 2.    Individual Conduct.

The Tenth Circuit will also often analyze officer action individually.  *E.g.,*
*Walton*, 745 F.3d at 421.  Yet, in so doing, the Court of Appeals will deny qualified
immunity not only when an individual officer used excessive force but also when an
officer failed to prevent other officers from using excessive force even though the
officer himself did not engage in excessive force.  *Walton*, 745 F.3d at 421 (citing
*Walker v. County of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006); *Currier v. Doran*,
242 F.3d 905, 919-25 (10th Cir. 2001)).  For example, in *Casey v. County of Federal*
*Heights*, 509 F.3d 1278, 1280-81 (10th Cir. 2007), two officers used force on a
plaintiff who removed a file from a courthouse, which was a misdemeanor.  One
officer tackled the plaintiff, and the other used a taser on him.  *Id*.  As part of  its
qualified immunity analysis, the Court "discuss[ed] the liability of [the officers]
individually."  *Id*. at 1281.  The Court determined that each officer violated the
plaintiff's clearly established constitutional rights, and that the officer who tackled

---

[6](...continued)
risk to anyone, the first inquiry applicable under the Fourteenth Amendment is plainly
satisfied. *E.g., id.* (concluding that it was clearly established that using substantial
force against a suspect who has been subdued or incapacitated constitutes excessive
force).

the plaintiff could be held liable under § 1983 for doing "nothing to prevent [the second officer] from Tasering him and other officers from beating him." *Id*. at 1283. Thus, even if a single deputy's use of force was not excessive, "a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983." *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996).

Applying this approach here, it is clear that a jury could likewise reasonably conclude Corporal Moss and Deputy Shaner (who were both in the cell when the incident happened and physically participated in the violent takedown) and Deputy Drake and Deputy Toone (who were outside the cell) either made use of unnecessary and unreasonable force against Mr. Geddes or failed to intervene when the other Individual Defendants did so, or both.[7]

---

[7] It is worth noting that Defendants do not raise (see Motion at p. 7) an argument that any one of the Individual Defendants is not liable under Section 1983, or even attempt to address the actions of each such Defendant; but, instead, make an argument only about their behavior in the aggregate.

### a. *Corporal Moss*.

Our analysis applied above to the Individual Defendants in the aggregate applies with equal force to the actions of Corporal Moss, as the individual jailer who actually employed the violent takedown technique against Mr. Geddes. Accordingly, based on the facts addressed above and for the same reasons, a jury could reasonably conclude that Corporal Moss employed unnecessary and excessive force against Mr. Geddes. *E.g., Lundstrom*, 616 F.3d at 1126-27 (concluding that the district court erred in granting summary judgment on the plaintiff's excessive force claim based on officers' actions, after the plaintiff had been handcuffed, of pressing him up against a vehicle, shoving him to the ground, placing a knee to the back of his head, and twisting and rolling up his arm onto his head); *Robles v. Schultz*, 2010 U.S. Dist. LEXIS 29333, *38-40 (D.N.M. Mar. 15, 2010) (concluding that, accepting the plaintiff's version of facts as true, the conduct of the officers after taking the plaintiff to the ground when they assaulted him by kicking him in the face and ribs was not reasonable); *see also, e.g., E.g., Grass*, 322 Fed. Appx. at 590; *Weigel*, 544 F.3d at 1151; *Plascencia*, 705 F. Supp. 2d at 1286-1287.

### b. *Deputy Shaner.*

The same analysis also applies to the conduct of Deputy Shaner, given that Deputy Shaner actually, physically participated in the violent takedown of Mr. Geddes. Such participation, albeit based on disputed facts, is sufficient to require resolution by a jury of the issue whether he used excessive force. *E.g., Grass*, 322 Fed. Appx. at 590; *Weigel*, 544 F.3d at 1151; *Plascencia*, 705 F. Supp. 2d at 1286-1287. In addition, given that Deputy Shaner was present and able to intervene when Corporal Moss delivered unnecessary force against him when he was effectively restrained and posed no threat or risk of flight, a jury could reasonably find Deputy Shaner liable under Section 1983 for his failure to intervene. *E.g., Walton*, 745 F.3d at 422-423; *Mascorro v. Billings*, 656 F.3d at 1204 n.5; *Fogarty*, 523 F.3d at 1164.

### c. *Deputies Drake and Toone.*

Our analysis of the conduct of Deputies Drake and Toone is a bit different. Their actions, or lack thereof, calls upon us to consider whether they were present and able to intervene either before or when Corporal Moss and Deputy Shaner employed the violent takedown technique. Here, the record shows not only were they were present outside of the cell but, as Mr. DeFoe notes in his Expert Report, that they

failed to attempt to formulate a tactical plan before Corporal Moss and Deputy Shaner entered the cell; they failed to attempt to de-escalate the situation when Mr. Geddes was allegedly non-compliant; they failed to participate and offer alternatives to the use of force; and they failed to intervene when Corporal Moss and Deputy Shaner initiated their use of force against Mr. Geddes.

In light of all of this, if we approach the conduct of each Individual Defendant separately, a jury could reasonably conclude that Deputies Drake and Toone are in fact liable under Section 1983 for their failure to intervene. *E.g., Walton*, 745 F.3d at 422-423 (concluding that, because all of the defendants were present and observed the use of force over a two-to-three minute period and could have prevented or stopped the assault on the plaintiff, a reasonable jury could find any given defendant here liable for failing to intervene); *Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance."); *Fogarty*, 523 F.3d at 1164 (affirming the district court's denial of qualified immunity

on a failure to intervene claim because the defendant was present during the allegedly

unconstitutional arrest).

**B.    MR. GEDDES' RIGHT TO BE FREE FROM A USE OF EXCESSIVE FORCE IN THE CIRCUMSTANCES PRESENTED HERE WAS CLEARLY ESTABLISHED.**

"The relevant, dispositive inquiry in determining whether a right is clearly

established is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The question of whether a right is clearly established must be answered "in light of

the specific context of the case, not as a broad general proposition." *Saucier*, 533

U.S. at 201. "That is, the question is not whether the general right to be free from

excessive force is clearly established, but whether [the officer] had a clearly

established right under the facts of this case." *Morris*, 672 F.3d at 1196.

"'Ordinarily, in order for the law to be clearly established, there must be a Supreme

Court or Tenth Circuit decision on point, or the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains.'"

*Morris*, 672 F.3d at 1196 (citation omitted). "Because the existence of excessive

force is a fact-specific inquiry, however, 'there will almost never be a previously

published opinion involving exactly the same circumstances.'" *Morris*, 672 F.3d

at 1196 (citation omitted).  Accordingly, the Tenth Circuit has "adopted a sliding scale: 'The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'"  *Morris*, 672 F.3d at 1196 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).  As a result, the Tenth Circuit does not necessarily require case law specifically on point.  *Morris*, 672 F.3d at 1196-97 (so stating).  "'[W]hen an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law.'"  *Morris*, 672 F.3d at 1197 (citation omitted).  As the Tenth Circuit has made clear, "[a]n officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as [he] did."  *Casey,* 509 F.3d at 1286.

In keeping with these principles, we can readily conclude that there was no legitimate justification for the Individual Defendants to act as they did and, accordingly, that they violated clearly established law.  Their conduct was obviously egregious.  Indeed, case law in the Tenth Circuit and other jurisdictions clearly established, well prior to the incident at issue here, that the use of force on a subject

who is restrained is excessive. *E.g., Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (holding that it was clearly established law that "officers may not continue to use force against a suspect who is effectively subdued" and, under the facts presented, in which an officer continued to tase a suspect after he was subdued, denying the officers' motion for qualified immunity) (citations omitted); *Finlinson*, 2018 U.S. Dist. LEXIS 185262, *52 (concluding that, at the time the incident occurred, a reasonable officer could infer that force applied after a suspect has been handcuffed on the ground, when he or she poses no threat and is not attempting to flee, is unlawful).

In addition, the Tenth Circuit also clearly established, again well prior to the incident at issue here, that police officers face liability under Section 1983 for failing to intervene in order to prevent other officers from using excessive force. *E.g., Mick,* 76 F.3d at 1136. To be held liable, "the officers must have 'observed or had reason to know' of a constitutional violation and have had a 'realistic opportunity to intervene.'" *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (citation omitted).

## II. SUMMARY JUDGMENT IS INAPPROPRIATE ON MR. GEDDES' CLAIM AGAINST THE COUNTY.

The County contends (Motion at 9-12) that the claims against it should be dismissed because, the County says (1) Mr. Geddes cannot identify a constitutionally defective policy; (2) Sheriff Thompson did not himself engage in any wrongful acts or act with deliberate indifference to Mr. Geddes' constitutionally protected rights; and (3) there is no evidence of a direct causal link between an official County policy and the alleged constitutional violation.[8]  As we make clear below, however, a jury could reasonably conclude that the County, through Sheriff Thompson as the final policy maker, ratified the conduct of the Corporal and Deputies and, in so doing, adopted their actions and ostensible justifications as County policy.

As the County notes, "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  It can, however, be held liable "for [its] own

---

[8]  Defendants also contend (Motion at p. 8) that, because "there cannot be a Fourteenth Amendment violation against the officers, all claims against the County must be dismissed."  Again, we address that contention in this Memorandum, *infra*, at page 2, footnote.

unlawful acts" if the plaintiff shows "the existence of a municipal policy or custom which directly causes the alleged injury." *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017). The policy or custom requirement is met if a plaintiff can show the violative conduct was pursuant to a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers, or the deliberately indifferent failure to adequately train or supervise employees. *Id.*

Here, a jury here could reasonably conclude that the County is liability under Section 1983 based on the conscious and deliberate choice by Sheriff Thompson to ratify the conduct of the Individual Officers here. The ratification doctrine originated in *St. Louis v. Praprotnik*, 485 U.S. 112 (1988). A single decision by a municipal policymaker is sufficient to trigger municipal liability under *Monell*. *E.g., Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405-06 (1997).[9] In *Praprotnik*, a plurality of the Supreme Court explained:

---

[9] For instance, a decision to adopt a particular course of conduct represents official policy even if it is not intended to govern future conduct so long as the decision was made by a final policymaker. *E.g., Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992), *cert. denied*, 510 U.S. 932 (1993).

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127 (emphasis in original). The Court thus held that *post hoc* ratification by a final policymaker is sufficient to subject a city to liability because their decisions are policy. *Id.*; *see also, e.g., Bryson v. County of Okla. County*, 627 F.3d 784, 790 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 3030 (2011). In addition, an inadequate investigation may itself also amount to a ratification of unconstitutional conduct. *E.g., Rush v. County of Mansfield*, 771 F. Supp. 2d 827, 863 (N.D. Ohio 2011) (concluding that a jury could reasonably conclude that the Police Chief ratified an officer's unconstitutional actions by approving an investigation not designed to discover what actually happened, where investigating officer failed to interview any law enforcement officials but allowed them to prepare statements later due to "legal concerns" that the investigating officer claimed prevented him from interviewing the officers at the scene). "Ordinarily, ratification is a question for the jury." *Christie v. Iopa*, 176 F.3d 1231, 1238-39 (9th Cir.), *cert. denied*, 528 U.S. 928 (1999).

In keeping with these principles, it is clear that a jury could reasonably conclude that the County ratified the actions of the Corporal and Deputies. As the record shows, Sheriff Thompson, as the final policymaker, concluded that their action was "totally appropriate," because he said, Mr. Geddes was "running his mouth," was noncompliant, and he made a "threatening move" by turning to face Corporal Moss and Deputy Shaner. Further, contrary to the well-established legal principles that we discuss above, Sheriff Thompson testified that, given these factors, it did not matter to him whether Mr. Geddes's arms and hands were handcuffed behind his back. His decision, adopting the conduct and ostensible justifications for it proffered by the Corporal and Deputies, is final and attributable to the County as its policy. Moreover, in spite of Sheriff Thompson's claim to the contrary, there was not merely an inadequate investigation into the use of force that occurred here but there was no investigation at all. As Mr. DeFoe notes in his Report, the failure to investigate and abide by written policies reflects an endorsement and perpetuation of the conduct of the Corporal and Deputies. Pl. Exh. J (DeFoe Expert Report) at p. 14. Finally, not surprisingly, no one involved in the incident at issue were subjected to any disciplinary action as a result of the incident. In the end, in light of all of this, it is

difficult to imagine a clearer case of ratification. *E.g., Praprotnik*, 485 U.S. at 127;

*Bryson*, 627 F.3d at 790.

## CONCLUSION

The Court should (1) deny Defendants' Motion as to the Individual

Defendants; (2) deny the Motion as to the County; and (3) grant the Motion as to the

WCSO.

Respectfully submitted this 1st day of November 2019:

> */s/ Gregory W. Stevens*
> Gregory W. Stevens
> *Attorney for Plaintiff*
> *Hyrum James Geddes*

# CERTIFICATE OF COMPLIANCE

In accordance with DUCivR 7-1(a)(3), I hereby certify that this document complies with the word-count limit specified in that Rule. It is printed in 14-point Times New Roman type, a proportionally spaced font, and contains 9,999 words, excluding the face sheet, Table of Contents, Table of Authorities, signature block, this Certificate of Compliance, and the Certificate of Service. I relied on Corel WordPerfect X7, the wordprocessor used to create this document, to determine this count.

*/s/ Gregory W. Stevens*
Gregory W. Stevens

## CERTIFICATE OF SERVICE

I hereby certify that, this 1st day of November 2019, I served a copy of the foregoing Memorandum, together with the Exhibits cited in the Memorandum and a Table of Exhibits, via the ECF system, on the following counsel:

Frank D. Mylar, Esquire
Mylar Law, P.C.

*/s/ Gregory W. Stevens*
Gregory W. Stevens